UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

----oo0oo----

RESER'S FINE FOODS, INC., an
Oregon corporation,

        Plaintiff,

  v.

WALKER PRODUCE CO., INC., an
Idaho corporation and WALKER
PRODUCE FARMS CO., INC., an
Idaho corporation,

        Defendants.

NO. CIV. 07-336-S-WBS

MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY ADJUDICATION AND SUMMARY JUDGMENT

----oo0oo----

Plaintiff Reser's Fine Foods, Inc. initiated this breach of contract action based on its contract with defendants Walker Produce Co., Inc. and Walker Produce Farms Co., Inc. Defendants now move for summary adjudication to establish that the target volume of the parties' contract was 500,000 hundredweight of potatoes and summary judgment with respect to

1

plaintiff's ability to recover damages.

I.   Factual and Procedural Background

During a personal meeting on March 28, 2005, plaintiff and defendants executed a written Potato Supply Agreement (PSA) in which defendants would "deliver" and plaintiff would "accept" a target volume of potatoes each month. (Defs.' Stmt. of Undisputed Facts ¶ 1.) With respect to the "Annual Delivery Volume," the PSA provides that defendants "shall be obligated to provide [plaintiff] with a target volume of 500,000 cwt of . . . potatoes unless revised during the Annual Meetings based on mutual agreement pursuant to" the PSA. (Marotz Decl. Ex. 1 at ¶ 2.1.) It further provides for "Adjustments to Volume," stating that the parties "may agree to increase volume to 1,000,000 cwt during the season without waiting for the Annual Meetings." (Id. Ex. 1 at ¶ 2.2.)

While the PSA provides for 1,000,000 hundredweight only as an agreed-upon "[a]djustment[]," Mark Reser, plaintiff's president, contends that he intended to "lock[] up" an annual target volume of 1,000,000 hundredweight prior to executing the PSA. (Reser Dep. 58:22-25, 59:1-2.) Tony Kunis, one of plaintiff's managers, further alleges that defendants' president, Keith Walker, orally committed to the 1,000,000 hundredweight target volume during the March 28, 2005 meeting. (Defs.' Stmt. of Undisputed Facts ¶ 3; Kunis Dep. 47:12-21.)

In the following week, Kunis and defendants' employee, Mike Meyer, allegedly discussed the PSA's target volume. (Kunis Dep. 53:23-25, 54:1-4.) On April 6, 2005, Meyer faxed a copy of a letter to Kunis. (Defs.' Stmt. of Undisputed Facts ¶ 12.) The

cover sheet of the fax states: "A draft is attached. If you need any changes simply let me know." (Marotz Decl. Ex. 4.) The sole paragraph in the un-signed letter accompanying the cover sheet states: "This letter confirms that [defendants] will provide an additional quantity of up to 500,000 cwt generated from the 2005 harvest seasons to Reser's if Reser's so desires. The terms in the existing [PSA] will apply to this additional quantity." (Id.) Handwritten notations on the letter state "Draft" and "Letter will be on [defendants'] letterhead." (Id.) In a subsequent phone conversation, Kunis allegedly told Meyer that plaintiff would take the extra 500,000 hundredweight. (Pl.'s Stmt. of Undisputed Facts # 103.) However, defendants contend that the parties never agreed to increase the target volume to 1,000,000 hundredweight. (Defs.' Stmt. of Undisputed Facts ¶ 4.)

Defendants began delivering potatoes pursuant to the PSA in October of 2005. Each week, plaintiff's scheduler, Marvin Scott McDonald, determined the volume of potatoes plaintiff would need the following week. (Pl.'s Stmt. of Undisputed Facts # 105.) Then, McDonald contacted each of plaintiff's suppliers to determine the volume that each supplier could deliver. (Id. at ## 106-07.) McDonald always contacted defendants first and contacted additional suppliers until its needs were met. (Id. at # 109; see also Reser Dep. 83:7-23 (indicating that plaintiff had a contractual obligation to buy 200,000 hundredweight from another supplier).) After fulfilling its needs, McDonald created a delivery schedule and issued purchase orders that specified the delivery dates and times for the volume of potatoes each supplier

indicated it could supply. (Pl.'s Stmt. of Undisputed Facts # 108.) Even if plaintiff desired a greater volume of potatoes than a supplier indicated it could deliver, McDonald allegedly neither demanded a greater volume nor issued a purchase order that exceeded the volume the supplier indicated it could deliver. (Id. at ## 110-11.)

Beginning with their first shipment in October of 2005, defendants allegedly did not deliver the monthly target volume of potatoes established in the PSA. (Adair Dep. 85:21-24.) In November and December of 2005, McDonald and Jeff Adair, one of plaintiff's managers, allegedly complained to Meyer and Walker that defendants were not fulfilling plaintiff's needs. (Pl.'s Stmt. of Undisputed Facts ## 113-16.) In response, Meyers allegedly informed them that defendants could not ship more potatoes because defendants could not obtain trucking. (Id. at # 116.)

Despite alleged frustrations, plaintiff remained hopeful and continued to work with defendants so it could obtain potatoes, even if at an insufficient volume. (Defs.' Stmt. of Undisputed Facts ¶ 7.) In February of 2006, Reser, Myer, Walker, Kunis, and Paul Levy met in Idaho to discuss defendants' alleged lack of deliveries. (Pl.'s Stmt. of Undisputed Facts ## 117-18.) At that meeting, plaintiff allegedly informed defendants that defendants were behind in their deliveries and that the shortages were affecting plaintiff's customers and business. (Id. at # 119.) Plaintiff also provided defendants with a spread sheet that tallied the volume of potatoes defendants had delivered pursuant to the PSA. (Leavy Dep. 89:21-24.) Defendants

1  allegedly informed plaintiff that they "honor[] contracts" and
2  that the deliveries would improve.  (Pl.'s Stmt. of Undisputed
3  Facts # 120.)

4         According to plaintiff, however, the situation did not
5  improve and, in March of 2006, Kunis allegedly contacted Meyer to
6  inform him that defendants were still not fulfilling plaintiff's
7  needs and that plaintiff had no potatoes.  (Id. at ## 121-22.)
8  Representatives from both parties met again on March 15, 2006 to
9  discuss the deliveries, at which time Reser allegedly complained
10 about defendants' lack of deliveries and explained that the
11 insufficient deliveries were affecting plaintiff's ability to
12 serve its customers.  (Id. at ## 123-24.)  At that meeting,
13 defendants allegedly told plaintiff that they could not deliver
14 additional potatoes.  (Id. at # 125.)

15        Prior to filing its complaint for breach of contract on
16 August 6, 2007, plaintiff had not explicitly declared defendants
17 in breach because it still wanted to obtain potatoes from
18 defendants.  (Reser Dep. 85-87.)  In its complaint, plaintiff
19 seeks damages for the difference between its cost to cover and
20 the PSA price, incidental and consequential damages, attorneys
21 fees, and costs.

22        Defendants now move for summary adjudication to
23 establish that the target volume of the PSA was 500,000
24 hundredweight.  Defendants also move for summary judgment to
25 establish that 1) plaintiff was not entitled to more potatoes
26 than it listed on its purchase orders and 2) Idaho Uniform
27 Commercial Code section 28-2-607(3) bars plaintiff from any
28 remedy because plaintiff failed to give defendants written notice

5

of their alleged breach.

## II. Discussion

Summary adjudication[1] and summary judgment are proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

Once the moving party meets its initial burden, the non-moving party "may not rely merely on allegations or denials

---

[1] The standard for summary adjudication is identical to the standard for summary judgment. See Fed. R. Civ. P. 56(a) ("A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim."); Mora v. Chem-Tronics, Inc., 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998). Therefore, the court's discussion of the summary judgment standard applies equally to defendants' motion for summary adjudication.

in its own pleading," but must go beyond the pleadings and "by affidavits or as otherwise provided in [Rule 56,] set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex Corp., 477 U.S. at 324; Valandingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989).

In its inquiry, the court must view any inferences drawn from the underlying facts in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court cannot engage in credibility determinations or weigh the evidence because these functions are reserved for the jury. Anderson, 477 U.S. at 255.

A.   Modification of the Target Volume

"[T]he primary aim in interpreting all contracts is to ascertain the mutual intent of the parties at the time their contract was made." Farnsworth v. Dairymen's Creamery Ass'n, 876 P.2d 148, 152 (Idaho Ct. App. 1994) (citations omitted). "The intent of contracting parties should, if possible, be ascertained from the language of the agreement, as the words used are the best evidence of the parties' intent." USA Fertilizer, Inc. v. Idaho First Nat'l Bank, 815 P.2d 469, 471 (Idaho Ct. App. 1991) (citation omitted). "Thus, where the parties' intention is clear from the language of their contract, its interpretation and legal effect are to be resolved by the court as a matter of law." Farnsworth, 876 P.2d at 152 (citation omitted). "However, where the parties' mutual intent cannot be understood from the language used, intent becomes a question for the trier of fact, to be ascertained in light of extrinsic evidence." Id. (citations

1  omitted).

2        The parties dispute whether any agreement to increase
3  the target volume from 500,000 to 1,000,000 hundredweight had to
4  be in writing.  Paragraph 2.2, titled "<u>Adjustments</u> to Volume,"
5  provides that "Supplier and Purchaser <u>may agree to increase</u>
6  volume to 1,000,000 cwt during the season without waiting for the
7  Annual Meetings."  (Marotz Decl. Ex. 1 at ¶ 2.2 (emphasis
8  added).)  While that paragraph is silent with respect to the
9  requisite form of such an agreement, paragraphs 11.1 and 11.8
10 demonstrate that the parties intended to preclude an oral
11 agreement from effecting an increase to the target volume.  <u>See</u>
12 <u>Shawver v. Huckleberry Estates, L.L.C.</u>, 93 P.3d 685, 692 (Idaho
13 2004) ("In determining the intent of the parties, th[e] Court
14 must view the contract as a whole.") (citation omitted).

15       Paragraph 11.1 provides that, "[n]o provisions of this
16 Agreement may be <u>amended</u> or waived except by a written document
17 signed by both parties."  (Marotz Decl. Ex. 1 at ¶ 11.1 (emphasis
18 added).)  Paragraph 2.2 is subject to paragraph 11.1's
19 requirement of a writing signed by both parties because
20 increasing the target volume from 500,000 to 1,000,000
21 hundredweight constitutes an amendment to the PSA and the PSA
22 does not exempt paragraph 2.2 from paragraph 11.1.  <u>See</u> <u>Howard v.</u>
23 <u>Or. Mut. Ins. Co.</u>, 46 P.3d 510, 514 (Idaho 2002) ("'Unless a
24 contrary intent is shown, common, non-technical words are given
25 the meaning applied by laymen in daily usage . . . in order to
26 effectuate the intent of the parties.'") (citation omitted).
27 Therefore, by the terms of the PSA, the parties intended to allow
28 for an increase of the target volume from 500,000 to 1,000,000

hundredweight only via a written agreement signed by both parties.

Here, it is undisputed that there is not a writing signed by both parties to effect an increase of the target volume from 500,000 to 1,000,000 hundredweight. Accordingly, defendants' motion for summary adjudication to establish that the PSA provides for a target volume of 500,000 hundredweight of potatoes will be granted.

B.   <u>Delivery Volume in Purchase Orders</u>

Defendants contend that this court should find, as a matter of law, that plaintiff waived the right to receive potatoes in excess of the volumes it indicated on its purchase orders. Defendants further argue that the purchase orders constituted a condition precedent to defendants' duty to deliver potatoes and, by not issuing purchase orders for the full target volume, plaintiff excused defendants' duty to deliver a greater volume of potatoes than plaintiff "ordered."

"A waiver is 'a voluntary, intentional relinquishment of a known right or advantage,' and the party asserting the waiver 'must show that he acted in reasonable reliance upon it and that he thereby has altered his position to his detriment.'" <u>Fullerton v. Griswold</u>, 136 P.3d 291, 295 (Idaho 2006). Paragraph 11.1 of the PSA provides that "[n]o provision of this Agreement may be waived except by a written document signed by both parties." (Marotz Decl. Ex. 1 at ¶ 11.1.) It is undisputed that plaintiff did not waive any of its rights under the PSA in a writing signed by both parties, therefore the volumes indicated in the purchase orders cannot constitute a waiver of plaintiff's

9

right to receive potatoes in excess of those volumes.

"A condition precedent is an event that is not certain to occur, but which must occur unless nonoccurrence is excused, before performance under a contract will become due." Johnson v. Lambros, 147 P.3d 100, 106 (Idaho Ct. App. 2006) (citations omitted). "A condition precedent may be expressed in the parties' agreement, implied in fact from the conduct of the parties, or implied in law (constructive) where the courts 'construct' a condition for the purpose of attaining a just result." Steiner v. Ziegler Tamura Ltd., 61 P.3d 595, 599 (Idaho 2002). "As a general rule, conditions precedent are not favored by the courts." Id. (citation omitted).

The PSA unambiguously provides that defendants had the duty to "deliver" and plaintiff had the duty to "accept" target volumes of potatoes on a monthly basis. It does not, however, make plaintiff's issuance of a purchase order a condition precedent to defendants' duty to deliver.[2]  As opposed to delegating the duty to "order" potatoes, the PSA itemizes monthly delivery, target, and acceptance volumes.[3] (Marotz Decl. Ex. 1 at ¶ 2.3; see, e.g., id. (establishing that, in October, the delivery volume was 37,499 hundredweight, the target volume was 41,666 hundredweight, and the acceptance volume was 45,832

---

[2] Paragraph 2.5 of the PSA obligates plaintiff to "provide to Supplier weekly a delivery schedule covering the following weeks deliveries." (Marotz Decl. Ex. 1 at ¶ 2.5.) Although plaintiff usually included its delivery schedules on the same document as its purchase orders, paragraph 2.5 applies only to delivery schedules.

[3] The court has and will continue to refer to these volumes collectively as "target volumes."

hundredweight).)[4]

Moreover, regardless of the volumes indicated on its purchase orders, plaintiff would be in breach of the PSA if defendants attempted to deliver and plaintiff refused to accept the target volumes established in the PSA. (See id. Ex. 1 at ¶ 8.2 ("Purchaser shall be in default if any of the follow events occur. . . . b. Purchaser fails to accept the Annual Volume during any crop year.  c. Purchaser fails to accept the Monthly Volume in any calendar month in any year.").) Therefore, the PSA does not grant plaintiff the authority to alter defendants' duty to deliver or its duty to accept the target volumes via its purchase orders.

The parties' conduct under the PSA is further illustration that the volumes indicated on the purchase orders did not affect the target volumes itemized in the PSA. See Mountainview Landowners Co-op. Ass'n, Inc. v. Cool, 136 P.3d 332, 336 (Idaho 2006) ("'The conduct of the parties to a contract and their practical interpretation of it is an important factor when there is a dispute over its meaning.'") (citations omitted). The undisputed evidence shows that plaintiff merely transcribed the volumes of potatoes that defendants indicated they could deliver onto its purchase orders. (McDonald Dep. 37:17-22, 67:4-9, 67:20-24.) Plaintiff explains it did not "order" more potatoes

---

[4] Section 28-2-311 of the Idaho Uniform Commercial Code for Sales is not applicable because that section applies only if a contract "leaves particulars of performance to be specified by one of the parties." Idaho Code Ann. § 28-2-311(1). The PSA establishes the target volumes defendants had to deliver, thus does not vest plaintiff with the responsibility of setting those volumes.

11

than the volume defendants indicated they could deliver because any "order" above defendants' indicated volume would have been a "phantom" order. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. 10-11.) The fact that defendants do not contend that they could have delivered more potatoes than the volumes stated in the purchase orders strengthens the reasonableness of plaintiff's position that including a greater volume in a purchase order would have been pointless.

Therefore, because the PSA explicitly provides that plaintiff's duty is to "accept" the pre-determined target volumes of potatoes that defendants "deliver[]," plaintiff's purchase orders could not unilaterally override the PSA. Accordingly, the court will deny defendants' motion for summary judgment with respect to plaintiff's ability to seek damages for un-delivered volumes that exceeded the total volume indicated on its purchase orders.

C.   Notice of Breach

Section 28-2-607(3)(a) of the Idaho Uniform Commercial Code requires that "the buyer [] within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy . . . ." Idaho Code Ann. § 28-2-607(3). The action section 28-2-607(3)(a) requires "is neither burdensome nor difficult," but requires that the buyer give "appropriate notice" so that the seller may be "alerted to the buyer's claims." Full Circle, Inc. v. Schelling, 701 P.2d 254, 259 (Idaho Ct. App. 1985). The Idaho Supreme Court has explained that the notice must be "reasonable," which is a question of fact that "depends on the nature, purpose, and

circumstances of the notification." Jen-Rath Co. v. Kit Mfg. Co., 48 P.3d 659, 664 (Idaho 2002); see also Arcor, Inc. v. Textron, Inc., 960 F.2d 710, 715 (7th Cir. 1992) ("[T]he buyer is not required to notify the seller that the buyer considers the deficiencies of a product to constitute a 'breach, . . . state all objections the buyer has[,] or . . . say he is holding the seller liable and threaten litigation.'") (citations omitted).

While section 28-2-607(3) does not require "any particular form of communication," Meldco, Inc. v. Hollytex Carpet Mills, Inc., 796 P.2d 142, 146 (Idaho Ct. App. 1990) (emphasis added), defendants argue that paragraph 11.8 of the PSA requires that a notice pursuant to section 28-2-607(3) be written. Paragraph 11.8 provides that "[a]ny notice or other communication required shall be given in writing and shall be delivered in person or [by] mail . . . ." (Marotz Decl. Ex. 1 at ¶ 11.8.) Upon first glance, paragraph 11.8 might be read to apply to any notice that is required by the PSA or required by law. However, upon closer analysis, construing paragraph 11.8 to include notices required by law, but not by the PSA, would stretch the PSA's language far beyond what the parties could have contemplated at the time they entered into the agreement.

"In determining the intent of the parties, th[e] Court must view the contract as a whole." Shawver v. Huckleberry Estates, L.L.C., 93 P.3d 685, 692 (Idaho 2004) (citation omitted). Paragraph 8.1 illustrates that the parties did not contemplate that a written notice would be required for a breach resulting from defendants' failure to deliver the annual or monthly target volumes. Specifically, in subsection (a) of that

paragraph, the PSA establishes that defendants will be in default of the PSA if they "breach[] any of [their] obligations under this Agreement and such breach continues for a period of thirty (30) days <u>after written notice</u> [from plaintiff]."  (Marotz Decl. Ex. 1 at ¶ 8.1 (emphasis added).)  Unlike subsection (a)'s requirement that plaintiff provide written notice before defendants may be held in default, subsections (b) and (c) of the same paragraph establish that defendants' failure to deliver the annual or monthly volumes will <u>automatically</u> result in their default.  (<u>See</u> <u>id.</u> Ex. 1 at ¶ 8.1 ("Supplier shall be in default if any of the following events occur . . . b. Supplier fails to deliver the Annual Volume during any crop year.  c. Supplier fails to deliver the Monthly Volume in any calendar month in any year.").)

        The parties' explicit requirement for written notice for all breaches by defendants except a breach arising from defendants' failure to deliver the annual or monthly volumes indicates that the parties did not intend to impose a requirement of written notice in the event that defendants failed to deliver the target volumes.  Defendants late-coming reliance on this paragraph underscores that defendants did not intend for the paragraph to apply to a section 28-2-607(3) notice at the time they entered into the PSA.  Specifically, defendants discussed paragraph 11.8 for the first time in their reply brief and neither referenced the paragraph nor argued that plaintiff's section 28-2-607(3) notice had to be in writing in their memorandum of points and authorities in support of their motion for summary judgment.

14

If parties desire to contractually supplant statutory requirements, they must do so with clear and unequivocal language.  Cf. Tusch Enters. v. Coffin, 740 P.2d 1022, 1030 (Idaho 1987) ("The majority of states permit a disclaimer of an implied warranty of habitability, but the disclaimer must be clear and unambiguous and such disclaimers are strictly construed against the builder-vendor.") (citations omitted); Livingston Parish Sch. Bd. v. Fireman's Fund Am. Ins., 282 So.2d 478, 481 (La. 1973) ("[I]n the absence of conflict with statute or public policy, insurers may by unambiguous and clearly noticeable provisions limit their liability and impose such reasonable conditions as they wish upon the obligations they assume by their contract.").

It is inconceivable that the parties in this case thought about every "notice or other communication required" by any federal, state, or local law and thereby intended paragraph 11.8 to supersede the requirements of those laws.  For example, the Idaho Uniform Commercial Code alone contemplates verbal notice in at least fifteen sections.  Idaho Code Ann. §§ 28-2-206(b), 28-2-207, 28-2-209, 28-2-309(3), 28-2-325(2), 28-2-327(1)(b), 28-2-328, 28-2-501, 28-2-503, 28-2-504, 28-2-515, 28-2-615, 28-2-705, 28-2-706, 28-2-729.  The parties simply could not have intended a one-sentence, boiler-plate provision to encompass the universe of laws requiring a notice or communication.

When parties supercede statutory requirements, they simultaneously supplant the public policy codified in the statute.  Here, section 28-2-607(3) serves to "alert[ the seller]

to the buyer's claims" when "the seller may not know that his tender did not conform to the contract." Full Circle, Inc. v. Schelling, 701 P.2d 254, 259 (Idaho Ct. App. 1985). This policy, however, is balanced against the severe implications for failure to give such notice--i.e., the non-breaching party's loss of any remedy. Idaho Code Ann. § 28-2-607(3). Section 28-2-607(3), therefore, imposes a balance that protects the breaching and non-breaching parties by requiring "appropriate" notice that is "is neither burdensome nor difficult." Id. If the parties wish to depart from this policy, their intent to do so must be unequivocally expressed in the contract.

Therefore, the court finds, as a matter of law, that paragraph 11.8 does not supercede section 28-2-607(3)'s more lenient standard that allows for an oral notice of breach.

There is sufficient evidence to withstand defendants' motion for summary judgment with respect to plaintiff's section 28-2-607(3) notice. First, McDonald and Adair testified that, in November and December of 2005, they complained to defendants that defendants' deliveries were not fulfilling plaintiff's needs. (Pl.'s Stmt. of Undisputed Facts ## 113-16; see also Adair Dep. 86:9-14 (describing a "heated" conversation in which Adair informed Walker that "we're not getting our potatoes on a weekly basis").) Second, at the meeting in February of 2006, plaintiff's employees testified that they informed defendants that defendants were behind in their deliveries and that the shortages were affecting plaintiff's customers and business. (Pl.'s Stmt. of Undisputed Facts ## 117-19; see also Leavy Dep. 89:21-24 (stating that plaintiff provided defendants with a

16

spread sheet indicating the volume of potatoes defendants had delivered).) Again, at the March 15, 2006 meeting, plaintiff's employees testified they informed defendants that their insufficient deliveries were negatively affecting plaintiff's ability to serve its customers. (Pl.'s Stmt. of Undisputed Facts ## 123-24.)

Therefore, a genuine issue of material fact exists as to whether, at the March 15, 2006 meeting, plaintiff gave "appropriate" notice to "alert" defendants to plaintiff's claim. Full Circle, Inc., 701 P.2d at 259; see also See Jen-Rath Co. v. Kit Mfg. Co., 48 P.3d 659, 664 (Idaho 2002) ("The reasonableness of a given action is generally a question for the finder of fact.") (citations omitted). Accordingly, the court must deny defendants' motion for summary judgment with respect to section 28-2-607(3)(a).

IT IS THEREFORE ORDERED that defendants' motion for summary adjudication to establish that the target volume of the PSA was 500,000 hundredweight be, and the same hereby is, GRANTED. In all other respects, defendants' motion for summary judgment is DENIED.

DATED: April 24, 2008

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE